OPINION OF THE COURT
Eve Preminger, S.
In this contested proceeding for approval of a proposed settlement agreement entered into by a special guardian appointed under Mental Hygiene Law article 81 on behalf of an incapacitated person, the court granted the request by family members of the incapacitated person for a hearing on the application (Matter of Pflueger, NYLJ, May 7, 1999, at 31, col 3).
At the hearing counsel for all family members except one stated that the family had reconsidered and were unwilling to present any evidence, either then or in the future, because they did not wish to expend more resources on this dispute. The remaining family member is the incapacitated person’s sister, Mrs. Freeh. Mrs. Freeh was appointed the general article 81 guardian for the incapacitated person with authority to address all matters relating to property except the two claims at issue here for which a special guardian was appointed.[1] Mrs. Freeh appeared through counsel and asserted that she was entitled to present proof at the hearing in her capacity as guardian. The court rejected this position on the grounds that the matters within the ambit of the special guardian were, by definition and prior ruling, outside the general guardian’s authority, and that the incapacitated person’s funds should not be used to pay two guardians and their counsel to address the same question. The court offered Mrs. Freeh a brief adjournment in which to retain other counsel to represent her in her individual capacity and to present the proof that she was allegedly prepared to present, qua guardian, on the date scheduled for the hearing. Mrs. Freeh advised the court that she, in her individual capacity, would not be prepared to present evidence on either of the dates offered.
*296 The hearing then proceeded. The only evidence submitted was the report of the special guardian. This record forms the basis of the decision of the court.[2]
Background
The incapacitated person, Kathleen Powers Pflueger, is an ailing, elderly woman of 83. She lived with her husband of more than 50 years, Edward Pflueger, until his death in January 1997.
The Pfluegers had no children. During Mr. Pflueger’s life, he devoted substantial energy and resources to collecting porcelain. The porcelain, which figured prominently in the Pfluegers’ social life, was and still is displayed in the Pflueger home. The porcelain is extraordinarily important to Mrs. Pflueger, as it was to Mr. Pflueger.[3] The desire of Mrs. Pflueger’s family to secure a portion of this porcelain for themselves creates the present dispute.
There are differences between Mr. Pflueger’s will and the last purported will Mrs. Pflueger executed. Under Mr. Pflueger’s will, which was executed in October 1996, and admitted to probate by this court in February 1997, the porcelain, which is titled in Mr. Pflueger’s name, is bequeathed along with the balance of the bulk of his estate to a marital trust for the life benefit of Mrs. Pflueger. Upon Mrs. Pflueger’s death, the porcelain collection passes to the Boston Museum of Fine Arts and the balance of the trust property passes to Mrs. Pflueger’s siblings and their issue (the Powers family). Mrs. Pflueger’s 1991 will disposes of her entire estate, with no mention of the porcelain, to her siblings and their issue if her husband predeceases her. Thus, assets other than the porcelain will pass to the Powers family upon Mrs. Pflueger’s death *297 whether they are titled in the name of Mr. Pflueger or Mrs. Pflueger. The porcelain, however, will pass to Mrs. Pflueger’s family only if it should become titled in her name.
Currently, the porcelain is in Mr. Pflueger’s name. There are two possible avenues for changing title to Mrs. Pflueger. One is to assert her right of election against Mr. Pflueger’s estate which would entitle her to outright ownership of one third of the porcelain. The other is to sue Mr. Pflueger’s estate asserting that she is the actual owner of some of the porcelain, either jointly with Mr. Pflueger or by reason of gifts from him to her. Authority to address these two claims was conferred upon an independent guardian, Kristin Booth Glen, Esq.,[4] because of the conflict created by the enormous financial consequences to the family of these decisions (Matter of Pflueger, supra).
The special guardian reports that it is in Mrs. Pflueger’s best interests to refrain from asserting either claim because there are financial and nonfinancial costs associated with each claim and no personal benefit to Mrs. Pflueger. Additionally, the special guardian reports that she has reached an agreement with the Boston Museum, the executor and trustee of Mr. Pflueger’s will and counsel to the executor and trustee, which provides for substantial cash payments to Mrs. Pflueger and the marital trust in exchange for her decision not to pursue either claim.
Governing Standard
Before analyzing the special guardian’s recommendations, the appropriate standard for evaluation of the settlement agreement must be determined. The only standard articulated *298 in article 81 is contained in section 81.21 (e),[5] which requires a showing that:
“1. the incapacitated person lacks the requisite mental capacity to perform the act or acts for which approval has been sought and is not likely to regain such capacity within a reasonable period of time or, if the incapacitated person has the requisite capacity, that he or she consents to the proposed disposition;
“2. a competent, reasonable individual in the position of the incapacitated person would be likely to perform the act or acts under the same circumstances; and
“3. the incapacitated person has not manifested an intention inconsistent with the performance of the act or acts for which approval has been sought at some earlier time when he or she had the requisite capacity or, if such intention was manifested, the particular person would be likely to have changed such intention under the circumstances existing at the time of the filing of the petition.”
This is a codification of one variation of the judicial doctrine of “substituted judgment” (1992 Report of NY Law Rev Commn, Appendix A to Mem of Law Rev Commn, Relating to Article 81 of the Mental Hygiene Law Appointment of a Guardian for Personal Needs and / or Property Management, reprinted in 1993 McKinney’s Session Laws of NY, at 1984). While this variation of the substituted judgment standard has been referred to as an objective test (Matter of Florence, 140 Misc 2d 393, citing Matter of Christiansen, 248 Cal App 2d 398, 424, 56 Cal Rptr 505, 522-523), the component of the standard that requires consideration of the particular incapacitated person’s wishes by definition incorporates a subjective element.
The special guardian objects to application of this standard in this case, arguing that the statutory standard only applies to “transfers”[6] and not to contracts such as the settlement agreement. The applicable standard, according to the special guardian, is a different variation of the prearticle 81 judicial doctrine of substituted judgment which considers what the in *299 capacitated person would have done if she were competent and authorizes such action unless it would be demonstrably detrimental to the incapacitated person’s best interests, sometimes referred to as the subjective test.
In the prearticle 81 case law, both versions of the substituted judgment standard were applied in varying situations (e.g., Matter of Daly, 142 Misc 2d 85 [objective standard used where incapacitated person never had capacity to form an intent]; Matter of Florence, 140 Misc 2d 393, supra [objective test primarily used in transfers for tax purposes and subjective test primarily used in analyzing transfers for need]). Neither the statute nor its history explains why the statutory standard is based upon the language of the “objective” test but it may be supposed that the choice reflects the need to use an objective test for situations where no prior intent has been expressed and the belief that the subjective component (Mental Hygiene Law § 81.21 [e] [3]) of the statutory standard adequately incorporates consideration of the expressed desires of the incapacitated person. Indeed, the court agrees with the special guardian that, when known, the wishes of the incapacitated person should receive great weight (see, Mental Hygiene Law § 81.21 [a] [transfers should be authorized where the incapacitated person would have made the transfer if he or she had capacity to act]).
The need to consider the incapacitated person’s wishes is not extinguished by the branch of the statutory standard which requires the court to conclude that a reasonable person would be likely to perform the same act. This requirement allows approval of any act so long as it falls within the range of reasonable actions for a given situation. To read the statute less broadly would essentially eliminate from consideration the incapacitated person’s expressed desires which section 81.21 (e) (3) explicitly requires to be considered.
Accordingly, where the incapacitated person has indicated views on the act for which approval is sought or his desires are otherwise known, the court will approve the act even if it is not the optimal choice so long as it is within the parameters of reason.[7] On the other hand, where there is no information as to the incapacitated person’s intent regarding the act for which approval is sought, the court would be more likely to restrict approval to acts within the range of reasonable choices that would optimize the situation of the incapacitated person.
*300 Having concluded that the statutory standard gives meaningful deference to the wishes of the incapacitated person, the court need not strain to find the statutory standard inapplicable to transactions other than transfers, a conclusion suggested by neither the language nor the history of the statute. Creation of such a distinction, it is further noted, would spawn nettlesome anomalies such as the one that would be presented here where the exercise of the right of election would be analyzed as a transfer subject to the statutory standard (Matter of Mattel, 169 Misc 2d 989 [applying section 81.21 (e) to determine whether a spousal right of election should be exercised]) while the contract not to exercise the right would not.
For the foregoing reasons, the court concludes that the statutory standard of section 81.21 (e) governs analysis of the settlement agreement.
Evaluation of the Settlement Agreement Pursuant to Mental Hygiene Law § 81.21 (e)
The settlement agreement provides that, in exchange for the decision not to assert either the right of election or a claim to any of the porcelain, the Museum will: (1) pay the sum of $100,000 per year for Mrs. Pflueger’s life to the marital trust, with a minimum guaranteed payment of $400,000; (2) pay the sum of $1.2 million to the marital trust, 75% of which is to be distributed to the general guardian within 30 days of the trust’s receipt of the payment; and (3) give to Mrs. Pflueger porcelain valued at $500,000. Additionally, counsel to the executor and trustee of Mr. Pflueger’s will, Cravath, Swaine & Moore, agreed in the settlement agreement to reduce its request for legal fees by $150,000.
The benefits of the settlement agreement to Mrs. Pflueger are significant. Adding a minimum of $2.25 million to her resources ensures that Mrs. Pflueger will be able to remain in her Park Avenue home without having to liquidate any of the porcelain held in the trust. Without the settlement agreement, either the apartment or porcelain would need to be sold to fund the trust’s defense of the litigation[8] and perhaps necessary even if the family did not pursue the porcelain ownership liti *301 gation.[9] In light of the importance of Mrs. Pflueger remaining in her own home surrounded by her porcelain, established in the hearing for the appointment of a guardian and reiterated in the special guardian’s report in this proceeding, this benefit cannot be underestimated.
The cost of the settlement agreement is surprisingly small. Foregoing the right of election represents no cost at all to Mrs. Pflueger. Exercise of the right would merely transfer porcelain from the control of one fiduciary, the trustee, to another, her general guardian, without providing any real economic or other benefit. The same is true of successful assertion of an ownership interest in the porcelain.[10] Thus, assertion of either claim would not increase the assets available for Mrs. Pflueger.
Assertion of the claims would cause additional economic and psychic harm to Mrs. Pflueger. The right of election would add to Mrs. Pflueger’s individual assets approximately $3.275[11] million but would deprive her of the marital trust, originally valued at approximately $17 million, all of which would otherwise be available to her. The bulk of the porcelain would pass immediately to the Boston Museum, thereby causing her great emotional distress and trauma. Finally, as noted above, the costs of litigating the ownership claim would be extensive. Not only would Mrs. Pflueger’s individual assets be used to pay to litigate her claim to title of a portion of the porcelain, the *302 marital trust assets would also be used to pay to defend against that litigation. The trust, which is funded principally with the porcelain and Mrs. Pflueger’s residence, certainly would have to liquidate either the apartment or some part of the porcelain to defend the litigation.
The only conceivable indirect benefit of asserting the claims is that a future interest in the porcelain would be conferred upon Mrs. Pflueger’s family at the expense of the Museum. As to this point, the special guardian concludes, based upon extensive interviews with individuals close to the Pfluegers as well as review of the couple’s estate planning history, that Mrs. Pflueger would wish to benefit her family, yet also concludes, based upon interviews with Mrs. Pflueger and many others who knew the Pfluegers over the years, that Mrs. Pflueger, if competent, would not assert either claim because she, like her husband, wanted the porcelain to go to a museum and, in addition to her own desires, would not wish to violate her husband’s testamentary wishes.
Where, as here, a couple has a pattern, spanning half a century, of acting in unison, it is difficult to conclude that the survivor of the pair would break the pattern after the death of one. Here, Mrs. Pflueger’s failure to execute a will mirroring Mr. Pflueger’s 1996 will (i.e., leaving the porcelain to the Boston Museum [or acknowledging in a legally cognizable way that the couple intended the porcelain to pass under her husband’s will]) is clearly attributable to her legal incapacity to execute a will in 1996 rather than to any desire to depart from the couple’s pattern of dealing together with the porcelain.
In the absence of any evidence from the Powers family suggesting a different conclusion, the court concurs with the special guardian’s well-documented conclusion that Mrs. Pflueger would wish for the porcelain to pass to the Museum.
Applying the statutory standard, the court concludes:

(1) Mrs. Pflueger lacks the requisite mental capacity to perform the act or acts for which approval has been sought and is not likely to regain capacity within a reasonable period of time.

There is no contention that Mrs. Pflueger has the capacity or in the future will regain the capacity to decide herself whether to assert the two claims that are the subject of this proceeding.

(2) A competent reasonable individual in the position of Mrs. Pflueger would not assert either the right of election or claim an ownership interest in the porcelain.

*303 As noted above, the cost of asserting each claim is great and there is no corresponding benefit to the ward. A reasonable person would not incur such costs without a benefit.

(3) Mrs. Pflueger has not manifested an intention inconsistent with the performance of the act or acts for which approval has been sought at some earlier time when she had the requisite capacity or, if such intention was manifested, Mrs. Pflueger would be likely to have changed such intention under the circumstances existing at the time of the filing of the petition.

The voluminous evidence collected by the special guardian establishes that Mrs. Pflueger would wish to leave intact the estate plan of her husband, and also that, independent of his wishes, she would wish for the porcelain to pass to the Boston Museum.
Conclusion
The record in this proceeding establishes, by clear and convincing evidence, that the decision to forego both claims comports with Mrs. Pflueger’s wishes and is in her best interest. The settlement agreement, which confers substantial benefits upon Mrs. Pflueger in exchange for this decision, is also in her best interest. It is therefore approved.[12]

. As explained in the decision appointing the two guardians (Matter of Pflueger, NYLJ, May 5, 1998, at 26, col 6), the two claims at issue required appointment of a guardian independent of the family due to the serious conflict of interest a family member would face in acting upon the claims.

. The court wishes to thank Dean Glen for her excellent report. As the discussion of the facts (see, below) reflects, the extensive report thoroughly analyzed all relevant considerations. The legal standard applied by the guardian in her analysis, a subjective substituted judgment standard, is the appropriate one for the guardian to use notwithstanding the determination, discussed infra, that the statutory substituted judgment standard governs the court’s analysis of the transaction at issue here.

. The special guardian reports that Mrs. Pflueger referred to the porcelain as “my children” and that that characterization fit Mr. Pflueger’s relationship to the porcelain as well. In the proceeding for the appointment of a guardian, the court evaluator reported that Mrs. Pflueger said she would “kill herself’ if a portion of the porcelain were sold. In the same vein, the psychiatrist who examined Mrs. Pflueger at the family’s behest testified at the hearing that it would be in the best interest of Mrs. Pflueger’s mental health to keep the porcelain collection substantially intact.

. Kristin Booth Glen is Dean of the City University of New York (CUNY) School of Law where she also teaches Law and the Aging and Bioethics and the Law. In 1998, then Presiding Justice Alfred D. Lemer named Dean Glen to chair a committee on guardianship in the First Department. An active participant in the drafting and enactment of article 81, Dean Glen was also responsible for judicial training on article 81 and taught numerous training sessions for guardians approved by the Office of Court Administration. She is the coauthor of Guardianship Monitoring in the Supreme Court and wrote the introduction for the New York State Bar Association’s treatise on Guardianship of the Committee on Aging of the Association of the Bar of the City of New York. She is a member of the Executive Committee of the New York State Bar Association Elder Law Section and Co-Chair of its Elder Law Faculty Committee. Prior to joining CUNY, Dean Glen served as a Judge, first in the Civil Court, then in the Supreme Court and finally as an Associate Justice of the Appellate Term.

. As discussed infra, the history and spirit of article 81 are replete with references to respecting the wishes of the incapacitated person to the extent possible, a variation on this standard.

. Virtually any property transaction involves a transfer. The special guardian’s reference to transfers presumably is an abbreviation for “transfer of a part of the incapacitated person’s assets to or for the benefit of another person”, i.e., gratuitous transfers, applications for which must include specific allegations in the petition (Mental Hygiene Law § 81.21 [b]).

. This basic reasonableness also was required by prearticle 81 law under the subjective standard (e.g., Matter of Garbow, 155 Misc 2d 1001).

. Total legal fees requested in this litigation and paid from assets owned beneficially or outright by Mrs. Pflueger now exceed $1.5 million. The activity thus far consists only of this proceeding, where no respondents presented evidence at the hearing, and the proceeding to appoint a guardian where the need for a guardian was conceded and the only issue was who the most ap *301 propriate candidate would be. The amount of past litigation pales in comparison to the litigation and lawyers’ charges that may be expected on the assertion of a claim to the porcelain.

. Mrs. Pflueger’s expenses (excluding the substantial monthly maintenance on her Park Avenue apartment which is paid by the trust) exceed her assets by up to $2,000 per month. She does have personal assets, valued by the general guardian’s counsel at approximately $4.2 million plus tangible property held in the name of a corporation, but whether those assets will in the future suffice to defray her medical and other expenses is uncertain.

. Unlike the right of election, which is an entitlement, the claim to ownership of porcelain must be established. As to that claim, the special guardian reports that the evidence is inconclusive; that the legal standard is murky; and that as a consequence assertion of the claim would represent a great expenditure without substantial likelihood of recovery.

. All quantifications here are subject to the caveat that valuations will fluctuate based upon the market as well as ongoing expenses. Further, to the extent porcelain and the Park Avenue apartment are included in valuations, assumptions as to market value will affect the numbers. The critical points, however, do not change with the valuation fluctuations. Regardless of the absolute value of the porcelain, exercise of the right of election will reduce the assets beneficially available to Mrs. Pflueger. Similarly, the absolute value of the assets does not affect the conclusion that the cost of litigating a claim to ownership of the porcelain will deplete the assets.

. While the case presented by the special guardian is so compelling that burden of proof is irrelevant, it is worth noting that the burden in this situation, contrary to respondents’ assumption, would be on the respondents. The reason is that the transaction for which approval is sought enhances the assets beneficially available to Mrs. Pflueger while respondents, who seek to compel assertion of Mrs. Pflueger’s claims, are the ones seeking an expenditure of her assets for the purpose of effecting a transfer, on her death, to them of the porcelain. In such a situation, it is the respondents rather than the petitioner who are seeking judicial sanction of a transfer of the ward’s assets for the benefit of individuals other than the ward and thus the burden is on respondents to show that the transfer meets the requirements of section 81.21 (e) {cf., Mental Hygiene Law § 81.21 [f] [guardian has no obligation to bring a proceeding for gratuitous transfers]).