Matter of Edgar V.L. (2023 NY Slip Op 01360)

Matter of Edgar V.L.

2023 NY Slip Op 01360

Decided on March 16, 2023

Appellate Division, First Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: November 15, 2022

Before: Kern, J.P., Gesmer, Scarpulla, Rodriguez, JJ. 

Index No. 500294/2018 Appeal No. 16497-16498-16499 Case No. 2022-00247, 2022-00958, 2022-01285, 2022-02741 

[*1]In the Matter of Edgar V.L., an Incapacitated Person. Alison L., Petitioner-Respondent, Rachida Naciri, Respondent-Appellant, Judy S. Mock, Esq., Guardian-Appellant, Gary Elias, Esq., Court-Appointed Counsel-Appellant. 

Akerman LLP, New York (Donald N. David and Paul J. Collins of counsel), for Rachida Naciri, appellant.
Abrams, Fensterman, LLP, Brooklyn (Robert Abrams and Jeffrey R. Neuman of counsel), for Judy C. Mock, appellant.
Lewis Brisbois Bisgaard & Smith LLP, New York (Mark K. Anesh of counsel), for Gary Elias, appellant.
Farrell Fritz, P.C., Uniondale (Frank T. Santoro of counsel), for Alison L., respondent.
Meenan & Associates, LLC, New York (Coleen M. Meenan and Lissett C. Ferreira of counsel), for Special Guardian Lissett C. Ferreira, respondent.

Orders, Supreme Court, New York County (Carol Sharpe, J.), entered on or about August 24, 2021, on or about February 24, 2022, and on or about March 8,2022, which appointed a Special Guardian to Incapacitated Person Edgar V.L. (IP), removed Judy S. Mock, Esq. as court-appointed guardian and discharged Gary Elias, Esq. as court-appointed counsel, and appointed Donald Duboulay, Esq. as successor counsel and Katherine B. Huang, Esq. as successor guardian, unanimously affirmed, without costs. Appeals from order, same court and Justice, entered on or about June 21, 2022, which, to the extent appealed from as limited by the briefs, directed the parties to appear for a hearing on the Special Guardian's motion to remove Mock as guardian and discharge Elias as counsel, unanimously dismissed, without costs, as moot.
On October 2, 2018, Alison L., the sister and only sibling of Edgar V.L., brought a petition for the appointment of an article 81 guardian for her then 74-year-old brother. The petition alleged that Edgar, who is wealthy, but suffers from mental health issues and has some physical limitations, was the victim of systematic financial exploitation by Rachida Naciri. Naciri filed a cross petition to dismiss Alison's petition, or in the alternative to have herself appointed as Edgar's guardian.
A court evaluator (Britt Burner) was appointed on October 2, 2018, appellant Gary Elias was appointed as Edgar's attorney, and appellant Judy S. Mock was appointed as Edgar's temporary guardian of the person and property.
Burner prepared both an initial and supplemental report after meeting with Edgar on four separate occasions. Burner interviewed Edgar, Naciri, Edgar's home health aides, including his full-time home health aide (Robert Hicks), the managing agent of the building where Edgar lives (Rebecca Farley), and others. She also obtained a list of his medications, financial information, and spoke to Mock.
During Burner's first interview with Edgar, on October 16, 2018, she learned that on October 11th, nine days after the petition was filed and after a temporary guardian was appointed, Naciri and Edgar entered into a prenuptial agreement. Naciri assured Burner that she and Edgar had no intention of getting married. The prenuptial agreement provides that Naciri will receive $10 million if they divorce, no matter how long the duration of the marriage, and $20 million if they are still married when Edgar dies. Edgar recalled no details about the prenuptial agreement, nor could he remember who prepared it.
Notwithstanding Naciri's assurances to Burner on October 16th, that she and Edgar had no plans to marry, a wedding took place just two days later, on October 18th, at City Hall. Naciri later explained that she did not tell Burner about the wedding because she did not know they would be getting married. According to Naciri, Edgar "surprised" her by proposing.
Hicks, the only other wedding attendant, provided a very different account of the wedding day [*2]events. He said that Naciri told Edgar that day that she had a "surprise" for him, but refused to tell him what it was. The three of them went to Tavern on the Green, and afterwards proceeded to City Hall. Once there, Naciri reminded Edgar that he had always wanted her to marry him. She then told him the surprise was that "I want to marry you." When Burner asked Edgar about the wedding day, he denied being married. When Burner pointed to his wedding band, he said he had gotten married in Paris.
Burner learned from Hicks that Naciri frequently quizzed Edgar on certain pieces of information, such as when they were married, his medication, and the year and day of the week, before his meetings with Burner. Hicks also said that Naciri attends Edgar's therapeutic sessions with his psychiatrist, Dr. Bryan J. Bruno. Hicks told Burner that Naciri never stays at the apartment overnight and that she did not spend the wedding night with Edgar. On holidays, Naciri typically stops by for an hour or so, but then she leaves.
Burner also learned that Edgar gave Naciri a $90,000 wedding gift which, according to Naciri, was Edgar's idea. In that same month, October 2018, there was an attempt to transfer $600,000 from one of Edgar's investment accounts to a checking account. The transfer was flagged by the bank and failed. Edgar had no recollection of the transfer, had no idea why he would have tried to transfer that much money, or what it would have been for.
A registered nurse (Heather Sullivan) who provided care to Edgar told Burner that Naciri sometimes riled Edgar up, causing him to become verbally and physically abusive to his home health care workers. Other home health aides said Naciri was prone to screaming when she was angry and that this behavior, described by one aide as "toxic," upsets Edgar and triggers violent episodes in him.
Farley, the building's managing agent said that Edgar had been urinating in the hallways of his building and had been walking around in just his bathrobe. Farley also recounted that on one occasion Edgar had wandered out to the street alone and had been found sitting at the cross walk.
Edgar's long-time friends told Burner they were concerned about Edgar's rapid deterioration, describing him as looking drugged. One friend (Melinda Pillon) said that Edgar told her he was afraid of Naciri. Edgar once asked her to go with him to consult an attorney about getting a restraining order against Naciri, but Edgar did not pursue the matter. Pillon also said that when she last visited him, some eight months earlier, the apartment was in shambles and his bed was filled with crumbs.
Jackie Swiskey, a long-time friend of 40 years, said that Edgar had "back and forth" feelings about Naciri; sometimes she was his big love, but at other times he was afraid of her. Swiskey said Edgar wanted to cancel an agreement he had signed giving Naciri monthly financial "compensation," but when he went to his bank to stop the direct deposits, he was told [*3]he would need a lawyer.[FN1]
Burner learned from Alison that she and Edgar were not close, but that Edgar unexpectedly contacted her in April 2018, asking her to be his power of attorney. She agreed, but later learned that Naciri had been appointed his power of attorney instead. Alison said Pillon called her on Labor Day 2018 informing her that Edgar was in "crisis mode" but that Naciri would not let her into the apartment when Pillon went to check on him. Alison told Burner that Edgar's doorman called her on a different occasion, saying that one time Edgar's home health aide had run out of Edgar's apartment screaming for someone to call the police. When the police arrived, they took Edgar to the hospital where he was involuntarily admitted to the psychiatric ward. Edgar's doctor told Alison that Edgar might be suffering from dementia.
In contrast to the information provided to Burner by others, Naciri said that she cares for Edgar 12 hours a day, every day, she cooks and cleans for him and also organizes his bills so he can pay them. Naciri said Edgar chose her to be his power of attorney because Alison never signed the necessary paperwork. Naciri's attorney told Burner that Naciri and Edgar had been contemplating marriage for some time and that it was Edgar who chose the attorney that drafted their prenuptial agreement. Naciri denied attending Edgar's psychiatric sessions with him, and she said that the "friends" who Burner had interviewed were only after Edgar's money.
Burner reported that even after her first interview with Edgar on October 16th, she believed that he did not have capacity to handle his financial or medical affairs. She reported that Edgar could not "adequately understand and appreciate the nature and consequences of his inability to provide for his personal needs and finances" and that hewas "likely to suffer physical and financial harm" if a guardian was not appointed for him. Burner described how she had been unable to engage Edgar during their meetings or have any kind of meaningful conversation with him about his circumstances.
Oftentimes Edgar sat mute and did not answer her questions. Burner expressed doubts that Edgar would be able to meaningfully participate in any hearing the court would hold. In her supplemental February 2019 report, Burner observed that although Edgar seemed improved and the apartment was in better shape, he was still largely unresponsive and profoundly confused. Burner observed that Edgar was susceptible to coaching.
Burner ultimately recommended that a guardian be appointed for Edgar and that the appointment be for an unlimited duration. She also recommended that the "[g]uardian should investigate the circumstances surrounding whether Edgar had the capacity to enter into a prenuptial agreement and marriage with [Naciri], and . . . the payments being made from Edgar's account. . . ." Burner recommended that a geriatric care manager be appointed for Edgar and that the guardian file a bond.
On February [*4]14, 2019, the Hon. Tanya R. Kennedy began a testimonial hearing as to whether Edgar needed a guardian and if so, whether he had the capacity to consent to one. The court told the parties these initial proceedings were of a "narrow scope," solely to determine whether Edgar needed a guardian, but not to address the alarming issues surrounding the recent prenuptial agreement and marriage. Judge Kennedy also stated that there were "collateral matters that the guardian would address," adding that it was for the guardian to "make certain determinations regarding certain agreements."
Judge Kennedy initially found that Edgar lacked capacity to consent to a guardian. In doing so, the court described Edgar's failure to recognize Mock, although he had met her several times before, and his inability to provide a cogent answer to the court's inquiry about whether he thought he needed a guardian. Rather than answering, he simply referred to his attorney and said he (Edgar) had done nothing wrong. Edgar was confused as to time and place. When the court asked him where he was, he said a "tall building," in lower Manhattan, but failed to realize he was in a courthouse. When asked about his marriage to Naciri, he answered that he had gotten married five weeks ago although it was four months earlier. Edgar also provided certain nonresponsive answers to the court's inquiries, for instance volunteering that he was not allowed outside anymore because he had wandered about in his robe, been naked and had gone to a restaurant.
At the continued hearing, held on May 6, 2019, to determine whether a guardian should actually be appointed, Edgar appeared just as confused about where he was, why he was there, and the identity of the other people present. Edgar mistook Mock, who was sitting next to him, for his wife. He could not cogently explain what he thought a guardianship is. Edgar was uncertain of his age and could not provide any details about how he cares for his person and property, although he did know the location of one of his bank accounts. Samantha Fox, a geriatric care manager, testified that Edgar had once mistaken her for Mock and he suffers from short term memory loss. She opined that Edgar cannot care for himself nor handle money.
When the hearing concluded, the court granted Alison's petition for a guardian of the person and the property. The attorneys agreed at the time, on the record, that the guardian should be Mock and, pursuant to an order and judgment dated September 23, 2019, Mock was so appointed. The same order continued Elias's appointment as Edgar's attorney. The order of appointment expressly authorized Mock to provide Edgar with a $2,000 monthly stipend so he can pay for tips and personal items, but did not authorize any specific payments to Naciri for spousal support (see Mental Hygiene Law § 81.21[a][1], [2]).
Despite Edgar's functional limitations, and adjudication as an incapacitated person (IP), necessitating the appointment of a guardian[*5], Naciri, Mock and Elias (collectively, appellants) contend that Judge Kennedy intended that Edgar would have as much self-determination as possible concerning his finances and how he spends his money, whereas Alison contends Edgar is being victimized and the guardian must protect him from predatory acts and persons, including Naciri.
Mock filed a final account as temporary guardian on October 28, 2019, and a 2018-2019 annual account on May 30, 2020. The 2018-2019 accounting showed large credit card charges by Naciri for "personal expenses" including jewelry, clothing, and travel. That year, Naciri also received payments from Edgar's assets totaling $179,000. In December 2020, Alison filed objections to the accounting, resolution of which remains sub judice in Supreme Court.[FN2]
Alison then filed a petition and an order to show cause for visitation with her brother. Alison also asked that the court reappoint a court evaluator so that the circumstances of Edgar's marriage and the agreements he had ostensibly signed, including the prenuptial agreement, could be investigated. Alison claimed the marriage, entered into only after the guardianship proceeding was commenced, was a sham and that Mock and Elias, in dereliction of their fiduciary duties, had failed in the ensuing years to take any action to investigate these matters or protect him. The motion was separately opposed by Naciri and Mock. They each denied that Mock had any obligation to investigate the circumstances of the prenuptial agreement or marriage because there was no express directive in Mock's order of appointment to do so. Mock has held firm to this position throughout these proceedings. She admitted in court that, in accordance with her understanding of her order of appointment, she never took any steps to investigate the prenuptial agreement or marriage. In fact, at a July 21, 2021, appearance, in response to Alison's counsel's demand to know why an investigation of Edgar's marriage had not yet taken place, Mock represented that "my directives were crystal clear. My directives were not to vacate the marriage, not to do a full investigation."
By order to show cause returnable June 30, 2021, Alison again sought the reappointment of the court evaluator to investigate the circumstances of Edgar's marriage to Naciri, and any agreements made within one year of the guardian's appointment. Naciri interposed written opposition to the motion, but neither Mock nor Elias opposed this motion in writing.[FN3]
These motions were heard by Hon. Carol Sharpe, the judge newly assigned to this matter.[FN4] Judge Sharpe observed that although Judge Kennedy had ordered that the issues raised in Burner's report would not be addressed at the capacity hearings, Judge Kennedy had further ordered that those issues would be dealt with by the guardian once appointed. Judge Sharpe summed up her findings as follows:
"The looming issue is what led up to that marriage, what led up to the prenuptial agreement, and the fact [*6]that Judge Kennedy left it open for a further investigation, the spending of the amount of money that is being spent, the fact that Edgar is now in a home . . . I think that we need an investigation, and it is  and whatever the result of the investigation by a special guardian will be what it is."
The court determined that a special guardian was needed and issued its order appointing the special guardian (Lissett C. Ferreira), on August 24, 2021, resolving that part of Alison's petition seeking an investigation. This is one of the orders challenged in this appeal.
The order provides Ferreira with limited powers, authorizing her to, among other things: 1) investigate the possibility of a safe discharge of Edgar to his residence in the community and engage a geriatric care manager to assist in the assessment; 2) investigate the circumstances of Edgar's marriage, as well as the prenuptial agreement; 3) investigate the financial circumstances of transactions during the guardianship and in the preceding years; and 4) review Edgar's financial records for a period of five years preceding the date of Mock's order of appointment.
Beginning in November 2021 and continuing through February 2022, the parties engaged in a rapidly escalating tumbleweed of highly contentious litigation, filing a series of overlapping motions and cross motions. As relevant to this appeal, Ferreira brought a motion on January 13, 2022, to have Mock removed as Edgar's guardian and to discharge Elias on the basis that they had a conflict of interest and had breached their fiduciary duties to Edgar by supporting Naciri's arguments, rather than acting independently to protect Edgar and his assets. Alison filed papers in support of Ferreira's motion. On January 21st, Naciri brought a separate motion to have the special guardian removed.
In opposition to the motion to remove Mock and Elias, Naciri argued that Edgar wanted to keep Mock and Elias as his fiduciaries. She argued that Ferreira and Alison were "meddling" in Edgar's life and causing him distress. Elias and Mock each separately opposed the motion for their respective discharge and removal. Mock averred that she was protecting Edgar's interests and honoring his wishes.
On the February 1, 2022, the return date of Ferreira's motion to remove Mock and discharge Elias, the court learned that Edgar had been hospitalized and there was an emergent issue of Edgar's safe discharge. The issue was whether he could be safely released to his apartment or whether he should be returned to the assisted living facility (ALF) where he apparently had been living for over two years. The court ordered that Fox, Edgar's geriatric care manager, provide a written report with her professional assessment and recommendations. The court then stated, "I need the guardian to investigate whether or not [Edgar] should be discharged home. . . ." and observed that prior to being placed in the ALF, Edgar had round the clock health care at home that had been [*7]privately paid for with his own funds. Fox's attorney represented that her client and the guardian would work together. However, upon prompting by Mock's attorney to clarify whether the investigation was to be conducted by Mock, as guardian, or by Ferreira, as special guardian, the court stated, "[the geriatric care manager] is to report to the special guardian. . . .I need to hear from the special guardian as to. . . .what [Edgar's] status is and where he should be released to." The court also set a briefing schedule that day for all of the extant motions. Naciri's, Mock's and Elias's papers were due by February 22nd, Ferreria's reply, if any was due by March 15th, with a court appearance scheduled for March 24th.
A flurry of correspondence ensued after that court appearance. Fox's attorneys updated the court on Edgar's status, reporting it was "technically feasible" for him to be discharged to his apartment, provided all necessary medical equipment was available and other safety measures were in place. On February 14th, however, Mock's attorney advised the court that Edgar would be released to the ALF where he had previously resided. Mock made this decision without any explanation why a discharge home was inadvisable, despite Fox's recommendation. In further correspondence dated February 23rd, Mock's attorney, without elaboration, advised the court that it was Edgar's "wish" that he return to the ALF.
Mock's attorney again wrote to the court, citing ongoing confusion among the health care professionals about who was in charge of making the ultimate decision of where Edgar would be discharged to, warning that Edgar's discharge was in limbo. On February 24th, Mock's attorney urged the court to sign an order authorizing Mock to effectuate Edgar's discharge from the hospital to the ALF. Mock still had not considered any option other than returning Edgar to the ALF and she provided no fully reasoned explanation to the court for why that was in Edgar's best interest. Alison's attorney sent a letter, dated February 24th, stating that Alison had been deprived of any meaningful information about Edgar's care and was surprised to learn he was receiving end-of-life care.
By order dated February 24, 2022, Supreme Court removed Mock and discharged Elias. This order is also the subject of this appeal.[FN5] In relevant part, the February 24th order states Mock was removed, and Elias discharged for the following reasons:
"It is evident from the filings, and now the attorney's letters by Mr. Abrams, that the court appointees, both the Guardian and counsel to [Mr. L.], joined by Ms. Naciri who has a direct interest in the investigation into her marriage, oppose this Court's appointment of the Special Guardian and her recommendations that they be removed."
The court added that it had appointed Ferreira as special guardian because an investigation was required into the marriage, as well as the financial expenditures authorized by Mock and the circumstances of why Edgar [*8]was in an ALF, given that he had the financial means to pay for quality home care and owned a two-bedroom apartment. The court stated that although it was Edgar's personal needs and property management that were the focus of this proceeding, Mock and Elias had lost focus of that, instead litigating matters tangential to his well-being, including Ferreira's involvement in these proceedings. The court cited Mock's failure to fulfill her duties, including the court's purported directive that an investigation was needed into whether Edgar could be safely discharged home. Having been apprised that a "dangerous situation . . . has arisen," the court ordered Mock's immediate removal and discharged Elias. A new attorney was appointed for Edgar and on March 8, 2022, the court appointed a successor guardian for him. This order appointing a new guardian is also the subject of this appeal.
While the appeal was being perfected, this Court granted a limited stay of the hearing on Ferreira's motion, pending determination of the appeal. During the pending stay, Supreme Court issued an order on June 21, 2022, scheduling a hearing on Ferreira's motion. Appellants also challenge this scheduling order on appeal.
Alison's standing has been an overarching issue raised in connection with each order appealed from. We hold that Alison had standing to commence this article 81 proceeding as a "person . . . concerned with the welfare of the person alleged to be incapacitated" (Mental Hygiene Law § 81.06 [a] [6]; see Matter of de Menil (de Menil), 195 AD3d 410, 410 [1st Dept 2021]). This is a broad category of persons and standing does not rest on whether the alleged incapacitated person and the petitioner are friendly or not. Consequently, we reject any argument that Alison's and Edgar's estrangement affects standing. Not only did Alison have standing to commence the underlying article 81 proceeding, she also has standing to participate in these further proceedings to have the guardian discharged or her powers modified. Alison also has standing to pursue collateral relief as pertains to such issues (see Mental Hygiene Law §§ 81.35, 81.36 [b]), including seeking to compel an investigation into the claimed sham marriage here. Naciri's further argument, that Alison lacks standing to seek annulment of her marriage to Edgar rests on the mistaken application of Domestic Relations Law §140 (c). The issue before this Court is not whether Alison has standing to annul the marriage. Indeed, Alison's petition did not seek authority to annul Edgar's marriage. Rather, in light of Burner's recommendations, and the record developed before Judge Kennedy, Alison was seeking relief against the guardian, based upon Mock's failure to independently investigate and determine whether the marriage should be annulled. Marriage is a civil contract between two wedded individuals, and among the powers of an article 81 guardian is the power to manage the IP's property, including contracts. Where an article [*9]81 guardian has been appointed for an IP and the individual is found to have been incapable of understanding the nature, effect, and consequences of the marriage, annulment of the marriage is an available remedy for the guardian to pursue (Mental Hygiene Law § 81.29 [d]; Matter of Kaminester v Foldes, 51 AD3d 528, 529 [1st Dept 2008], lv dismissed and denied 11 NY3d 781 [2008]).
Appellants' argument, that Supreme Court's order appointing a special guardian was issued sua sponte and in violation of Edgar's right to due process, is rejected. The appointment was a consequence of Alison's motion for an independent investigation. Appellants were on notice of that motion and Naciri opposed it in writing. Mock and Elias did not file written opposition, but they orally addressed the merits in court.
Although appellants also contend it was statutorily impermissible for Supreme Court to appoint a special guardian because Edgar already had a guardian and the statute does not allow for an IP to have both, this argument is unavailing. Contrary to appellants' contention, the court could properly appoint a special guardian despite the prior appointment of Mock as guardian (see e.g. Matter of Ruth TT, 283 AD2d 869, 871 [3d Dept 2001]; Matter of Pflueger, 181 Misc 2d 294, 295 [Sur Ct, NY County 1999]). Furthermore, a comparison of the orders appointing Mock and Ferreira demonstrate that Ferreira's appointment did not create redundancy. Ferreira was not charged with marshalling Edgar's assets or making ultimate decisions. Those duties remained with Mock. Besides investigating the circumstances of Edgar's marriage, the court tasked Ferreira with gathering information about why Edgar was placed in an ALF despite having sizeable assets that would have allowed him to have high quality care at home. There were other disturbing matters brought to Mock's attention that Mock refused or neglected to investigate, including why Naciri was using Edgar's credit cards to travel and making large expenditures for clothing and expensive jewelry, none of which benefited Edgar. Appellants cite no statutory or legal authority that would have prevented the court from appointing a special guardian to aid the court, prepare a report and protect Edgar's interests once Mock had failed to do so herself.
Appellants' further argument, that Ferreira's appointment was detrimental to Edgar's health and well-being, engendering a great deal of confusion among health care providers as to who would decide Edgar's discharge from the hospital, is also rejected.
Appellants ask this Court to vacate the February 24th order removing Mock as Edgar's guardian and discharging Elias, and the subsequent appointment of a successor guardian, raising procedural as well as substantive arguments. Procedurally, appellants contend that the motion was decided prematurely, before it was fully briefed and argued, and without there being a testimonial hearing. These arguments fail. By February 22nd, the appellants had [*10]fully briefed Ferreira's motion for Mock's and Elias's removal; the only papers outstanding were Ferreira's reply, which was due March 15th. The absence of a reply did not prejudice appellants, who had no right to a surreply (see CPLR 2214[b], [c]; Coleman v Korn, 92 AD3d 595 [1st Dept 2012]). The motion for Mock's removal and Elias's discharge was fully papered by appellants when it was decided by the court.
The Mental Hygiene Law does not support appellants' contention that they were entitled to a testimonial hearing in this case before being removed. Mental Hygiene Law § 81.35 provides that a guardian may be removed when she or he "fails to comply with an order, is guilty of misconduct, or for any other cause which to the court shall appear just" (see Matter of Mary Alice C., 56 AD3d 467, 468 [2d Dept 2008]). A motion on notice, served on the persons specified in Mental Hygiene Law § 81.16 (c), is required but there is no statutory right to a hearing (see Mental Hygiene Law §§ 81.16[c]; 81.35). This relaxed requirement stands in distinction to Mental Hygiene Law § 81.11 (a), which provides that the petition for the appointment of a guardian for an alleged IP, whose liberty interests are at stake, "shall be made only after a hearing" (Matter of Eggleston [Muhammed], 303 AD2d 263, 266 [1st Dept 2003]; Matter of Ruth TT, 267 AD2d 553, 554-55 [3d Dept 1999]). The reason a guardian has "no due process right to a full hearing," nor is a "full blown" hearing necessary for their removal, is that a guardian has no "property interest" to protect (Matter of Bauer, 216 AD2d 25, 26 [1st Dept 1995], appeal dismissed 86 NY2d 867 [1995], lv dismissed and denied 87 NY2d 952 [1996]).
Although a guardian cannot be summarily removed in the absence of a fully developed record or without any findings, and a hearing may be required where material facts are disputed (see Matter of Roberts, 205 AD3d 562, 563 [1st Dept 2022]), here the parties had not only fully briefed Ferreira's motion, but the salient facts were also known to the court and largely undisputed. A decision to remove a guardian of the person and property of an IP is within the sound discretion of the trial court (Matter of Agam S. B.-L. [Janna W. - Richard P.],198 AD3d 962, 963 [2d Dept 2021]). Contrary to appellants' contention, a testimonial hearing was not necessary in this case because the court already possessed enough information for it to make findings justifying Mock's and Elias's removal, and they had an opportunity to be heard (cf. Matter of Roberts, 205 AD3d 562).
On the merits, the court properly exercised its discretion in removing Mock and discharging Elias. Undisputed before the court was the fact that Mock did not investigate and make a reasoned determination about the bona fides of the marriage and the prenuptial agreement. The circumstances presented throughout this case were alarming, raising red flags that at the time of the marriage and the prenuptial agreement Edgar was not competent[*11]. Mock's defense, that it was what Edgar wanted, misses the point. While it is important to solicit the views of an IP, those views cannot be the sole basis for action (or inaction). Were that the case, there would be no reason to appoint a guardian in the first place. Moreover, Mock is incorrect in adopting the position that she had no duty to investigate. The order did not have to expressly direct her to investigate these troubling circumstances, which implicated possible serious financial abuse. A guardian's duties under the Mental Hygiene Law require that such action be taken.
While such an investigation need not be undertaken in every case, here the issue was squarely raised in the court evaluator's report, identified by the court as an issue for Mock to address as guardian, and warranted given that the prenuptial agreement and marriage occurred so close in time to the filing and granting of the article 81 petition, further buttressed by the evidence demonstrating how severely compromised Edgar was. Mock's failure to investigate was in dereliction of her duties.
Moreover, Mock's and Elias's conflicts of interest and ongoing litigation with Ferreira "overwhelmingly established just cause" for their removal because their actions were not in Edgar's best interests (Bauer, 216 AD2d at 26; see Mental Hygiene Law § 81.35). Although Mock and Elias argue that their litigation was necessary to protect Edgar from Ferreira, the record does not support this claim. Ferreira's appointment served Edgar's best interests, while Mock's and Elias's repeated attempts to frustrate her from carrying out her court-mandated investigations into Edgar's marriage and discharge from the hospital, under the stated rationale of doing whatever Edgar wanted, did not serve Edgar's best interests. Despite Mock's and Elias's characterization of the court's removal order as a wrongful retaliation for their having appealed Ferreira's appointment, it instead is more reasonably read as the court's recognition that Edgar's best interests cannot be served where there is infighting amongst his fiduciaries. Therefore, the court was justified in ordering Mock's and Elias's removal. The March 8, 2022, appointment of a successor guardian was unavoidable and necessary given that once Mock was removed, Edgar still needed a guardian of the person and property.
Mock's separate argument that her removal was motivated by Judge Sharpe's personal feelings towards her has no basis in this record.
Concerning this Court's stays and the trial court's June 21, 2022, order, the appeal from that order is dismissed as moot because no hearing was held on the issues implicated by that order, and none was necessary.
We have considered appellants' remaining arguments and find them unavailing.
The Decision and Order of this Court entered herein on November 15, 2022, is hereby recalled and vacated (see M-2022-04971 & M-2022-05179 decided simultaneously herewith).
THIS CONSTITUTES THE DECISION [*12]AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: March 16, 2023

Footnotes

Footnote 1: This was an apparent reference to an agreement signed by Edgar in February 2018, which was not disclosed by Naciri until later in these proceedings. The validity of this agreement, as well as Mock's payments thereon, are the subject of as unadjudicated disputes in this guardianship proceeding.

Footnote 2: The financial disputes, like other matters in these proceedings, are highly charged. However, because these matters are unresolved and they were not the basis for the orders challenged on this appeal, we do not address them in this decision.

Footnote 3: Mock belatedly filed opposition papers on February 22, 2022, well after the court had appointed Lissett C. Ferreira to conduct an investigation.

Footnote 4: By this time, Judge Kennedy had been elevated to sit on the Appellate Division, First Department.

Footnote 5: Naciri's motion for the special guardian's removal, however, remains undecided.